The next case on the court's duct is 522-0408 Eagle v. William Frakes, F-R-A-K-E-S. Ms. Nam, the defendant. You may proceed. May you please the court, counsel. Ms. Nam, on behalf of William Frakes. There are five arguments on appeal. The focus today will be on arguments three and one in that order. To briefly review, the state charged Mr. Frakes with three counts of child pornography. And such a charge does not apply to a person who does not voluntarily possess such an image. Possession is voluntary if a defendant knowingly procures or receives such an image for a sufficient amount of time to be able to terminate his possession. Here, after a jury trial, Mr. Frakes was found guilty of the three counts. So turning to the third argument, where the trial court failed to adequately comply with Illinois Supreme Court Rule 431B for the zero admonishments, the issue is whether the trial court's error amounts to first-pronged plain error in that the trial evidence was closely balanced specifically in regards to the mental state or the knowing possession, the knowing involuntary possession of the three images at issue. To begin, this court should accept the state's concession that the trial court committed a clear and obvious error. The court, at times, did not inquire of the jurors as to whether they understood the four principles. Other times, the court didn't ask if they accepted the four principles. So this court should accept the state's concession. Thus, the question that remains before this court is whether the evidence at trial was closely balanced. Notably, a defendant does not have to testify at trial for the evidence to be close. The state's evidence on its own can amount to a closely balanced case where the state's evidence allows for competing conclusions. Here, the evidence related to the mental state element or whether Mr. Frakes knowingly involuntarily purtured, received, or possessed these three images was closely balanced for multiple reasons. First, the state agrees that its case was circumstantial. Mr. Frakes never confessed or admitted to seeking out, searching for, procuring, receiving, downloading, uploading, deleting, or accessing any of these three images. Second, there were no eyewitnesses that saw Mr. Frakes with child porn or downloading, uploading, possessing, or accessing these three images at issue. And this case is comparable to the Jaynes case before this court. There was an anonymous complaint made about the defendant, Jaynes, having child pornography images. There was also another witness, who was the ex-wife, who also witnessed him with such images. Here, there's no type of eyewitness or witness to these offenses. There was some fairly extensive testimony given regarding the forensics and how they got the information from the phones and who the phones belong with. So there was extensive evidence that linked the phone to the defendant, correct? That's correct. The phone was linked to Mr. Frakes, but compared to Jaynes, there was actual witnesses who saw the defendant accessing or viewing the images on the device. Here, there is no connection such as that. There's the connection of him owning the phone, the Samsung phone that was unoperational, but there's no connection as to someone seeing him upload, download, access, or possess. And trying to be foundationally for this officer workman to testify to all the things he testified to. That's one of our arguments. Our fifth argument goes to these issues of Yahoo and Flickr. So Flickr is the photo storage account that's online. Yahoo apparently owns Flickr. And the state's law enforcement agents, so Perfield and Workman, they were testifying to the technology here. Workman was unable to... So Workman is not as much of an expert as Perfield. So there are problems with Workman not being able to access the images or turning on the phone, so they refer to Perfield. But there's an issue about the foundation regarding the testimony regarding Yahoo, regarding Flickr, and when I believe Workman was unable to answer some of the questions that were related to the functioning of Yahoo and Flickr because he wasn't an expert on Yahoo or Flickr. But the other part was that there were no... The images were actually not found on his phone as images. They were found as remnants, so at some point the images were deleted, and so all they could find were these remnants, which ways civilians will not be able to reach. So Perfield was testifying how he was such an expert that he would be able to reach these remnants, but a lay civilian would not be able to get to them. So once it was deleted, it wasn't readily accessible to whoever had the phone. And that's another point that goes to the closely balanced nature of this case, was that the Samsung was not operational when they found the phone or they took the phone. So at the time, Mr. Frakes had an iPhone that was functional. The Samsung was not functional by the time that they acquired it. And I do want to point out the cases of Scolaro, Janes, and Gumilla to compare. Mr. Frakes, out of the 15,000 images, out of the images on Flickr, there were like 18,000 emails that the law enforcement agents were able to access. Out of all of that, they found these three, or they flagged these three images of child pornography. It's very comparable to cases like Gumilla, Scolaro, and Janes. So in those cases, there were thousands upon thousands of images. There were access to websites, 100 times, accessing websites that have these kinds of images on them. There was also a case regarding the defendant reading stories or downloading stories related to the type of crime. Here we have three images at issue as remnants. And again, there's no witness or eyewitness to connect Mr. Frakes as the one who downloaded or uploaded the images. And the other part for the closely balanced nature is that he was actually working at the time that these three photographs were uploaded. So he was a tour bus driver. He was driving to Missouri at the time, or he was in Missouri at the time, with a group that he was traveling with. And they were at the time when these photos were allegedly uploaded onto Flickr. And again, the Flickr account also was frozen or closed soon after. So again, there's no access at a certain point. Also, unlike the defendants, the Scolaro, Gumilla, and Janes, Mr. Frakes, there's no backup file. There's no hidden places. There's no websites that he has to pay for, that he has to access. And in this case, I believe in the other cases, there were no question that no one other than the defendant had access. But here, Mr. Frakes argued, or at least the defense pointed out, that Mr. Frakes' house was being occupied by his daughter, his daughter's girlfriend, his wife. I believe his eldest daughter was around. Actually, there was no evidence about his son, but he also has a son. And on the tour bus, when the photos were allegedly uploaded, there were multiple people on the tour bus. So it's not that we're arguing that anyone and everyone could have accessed his phones. We're narrowing it down to the people that were actually near his phone or had a close, proximate vicinity to the phone. There was some discrepancy with regards to the daughter who lived at the home or a daughter who was visiting the home. And the frequency of those visits, the discrepancy the wife said, kind of contradicted what the daughter said her involvement with the household was, right? That's correct, Your Honor. So I believe his second daughter was living in the house in 2015. His eldest, I believe, was married. But then she came over, had him unlock his whatever devices that she needed, because she either didn't have a laptop or access to the Internet. So she would come over, according to her testimony, and have him unlock whatever device she needed and use the device. So there's that testimony. That's correct, Your Honor. There's some evidence about the eldest and the second daughter maybe playing some favorites. So there were those issues. I didn't get to my second argument, but unless this Court has any questions, I'll come back in. We only have a few minutes after Mr. Daly. Okay. Thank you. Mr. Daly, I'm glad to see you aren't restraining yourself. Good morning, Your Honor. Counsel, my name is Patrick Daly. I'm here on behalf of the people. So let's talk a little bit about closely balanced. Closely balanced is one of those sort of concepts that has evolved and been examined through the course of Supreme Court precedent, Appellate Court precedent. I think, semi-onwards, we've had almost a purposefully ambiguous understanding of it where it comes down to, well, the common sense determination or evaluation of the evidence to see whether something is considered to be closely balanced or not. I think that a derivative conclusion we can make when we look at the case law, and some of which I cited in my brief, is that we typically see the closely balanced paradigm, if you will, where we've got sort of competing versions of the evidence, starting with cases like Seve, you've got state witnesses, you've got defense witnesses to provide equally plausible competing versions of things where the trier effect is required to make an assessment of credibility or at least equally plausible alternative explanations. We've seen it evolve then to where the state's own evidence, as I think counsel, someone alluded to, where there are inherent flaws in the state's evidence. You've got, you know, people are testifying under a deal with the government. They are perhaps inconsistent with prior statements that they've been given. You know, no cases without a support. What makes this case, I think, somewhat unique when we look at it in the closely balanced paradigm, if you will, is that the defense was really constructed on this. The government kind of got the goods on the guy. But maybe we can sort of poke some pinholes in the state's case by suggesting, not necessarily proving or establishing, that someone else could have accessed this phone, someone else could have uploaded these images, someone could have put these images on their phone, uploaded them to Flickr, and then turned around and deleted those images. Now, that being the case, and I appreciate counsel's arguments with respect to, you know, what the defense's perceptions are of the weakness of this case. But I also think, as Justice Brewer pointed out earlier, the state presented, I think, significant evidence to show really the important kind of fundamentals of the prosecution, possession, opportunity, control. And I think, although the evidence is circumstantial, no case law to my knowledge has stated that circumstantial evidence corresponds neatly with close to balance. Particularly circumstantial evidence could be particularly significantly strong, that the images were manipulated in such a way that the only one who could have really uploaded them, found them among thousands of images on his phone, and then specifically deleted them, would be the person that the state had gone to great pains to tie to the defendant. Yes, no one saw him accessing porn. I would imagine in the realm of child pornography prosecutions, you're going to find very few cases where such a luxury is available to the state. It is proof. The reason I say all this is I think that when we approach this argument of closely balanced, the first thing we have to ask ourselves is, is it really closely balanced, or is it really strongly balanced in the state's favor, the defendant trying to dredge up a reasonable doubt by trying to poke holes in the evidence? Because there's no balance here. There's no competing evidence. There's no competing witnesses. There's nothing competing at all. There are suggestions, which I think the defense court some points on, in suggesting that we can't allow that this could never happen. But the evidence is really overwhelming that when you look at control, opportunity, and the mechanics that revolve in the possession and the attempted deletion of the child pornography from the defendant's possession, the evidence is not really closely balanced. Now, I do want to just – Mr. Daley, but there was possession, opportunity, and control of this phone at the house as well. That's correct. There were many people on this account. The deletions could have been made immediately after the upload. In other words, you upload them, delete them, which still would have shown that they were deleted out of 18,000. I'm not confident about the expertise of the people who actually introduced all of this evidence at the trial and wonder what you have to say about the effectiveness of this counsel. Okay. There's sort of three things wrapped up into that. So I'll try to pull them apart. But when you talk about closely balanced, there was the same three categories, if you will, available to others in the household. That's first. Second, the effectiveness of this counsel. Well, okay. So first of all, starting with point number one, there's a lot of speculation sort of wrapped up into that. Now, what we have here is an individual. We have the state presented, I think, ample testimony that it's his phone. They have an umbrella account. He's the only one who has a Samsung. All of these accounts were in his name, okay, his phone number. And I think the point that Your Honor made is one I think I would want to make as well, that it doesn't make sense that someone else would download something onto the defendant's phone and upload it into an account also in the defendant's name and username and email address and phone number. And yet, and also on top of that, they would have to probably, number one, do that and then scour all these pictures to determine, you know, these are the three among the thousands which are child porn. We need to delete these from the phone. Again, you know, I think that the opportunity for someone else to do it, taken in the abstract, is going to exist in a lot of different type of forensic computer cases or cell phone cases. The way against that is the who, what, why, particularly the why, okay? Conversely, the state presented, I think, significant evidence, and we'll talk about the experts here in a second or the witnesses. But the state presented significant evidence that the manipulations that were involved were so extensive and so involved and so intimately tied to all identifiers on this phone, as being the defendant's phone, his accounts, his Yahoo, the Flickr, everything. It doesn't really allow for, I think, a plausible. Remember, it's a common sense evaluation of the evidence. It isn't a matter of this is a possibility, and therefore it destroys the likelihood or possible potentiality of closely balanced. It has to be a reasonable common sense understanding of it. A reasonable common sense understanding of this evidence doesn't allow for, I think, just simply stating, well, the phone was there. Maybe other people could have picked it up and said, I think I'm going to load some child porn and I'm going to delete it and I'm going to put it on account. It's not my name. That's fine. It's not his name. It just really isn't probably a plausible explanation. I do, however, wish to disagree with the Court, Your Honor, about whatever qualms or misgivings you have, and I think that may relate a little bit to the question you asked earlier about foundation. I want to preface it by saying foundation is not really part of this equation insofar as it's an admissibility issue rather than a value determination. Okay? Evidence can be super valuable but improperly admitted. I think that we could all agree on that. So we'll get to ineffective assistance of counsel then. So what we have here are two things. There are two witnesses. Workman, who sort of kind of laid the groundwork for the acquisition of the phone. He testified to certain things regarding Flickr, Yahoo, some basic information, and I add here and certainly here that counsel had essentially facilitated some of this discussion by way of the certificates, if you will, with regards to getting Yahoo, you know, the things that are sort of foundational aspects of that. And then Purview, who was more of the expert expert. First of all, I don't think Workman testified about anything involving expertise. I mean, he talked a lot about what's an e-mail and how to set that up, and I think anyone who's got a 12-year-old daughter probably could figure that out. And so it's not something particularly special or unique or something that's likely that none of these 12 jurors probably could have got stood up and said, well, yeah, I made a Google account just the other day. It's not really that hard. But nuts and bolts of it came with the forensic forensic expert who testified to the details of it, and I think that he provided extensive and I think very strong evidence with regards to the how that data is acquired and how it is uploaded and how it's deleted and the mechanisms by which that data can be acquired from a phone once a forensic examination is made of it. Workman's, I think, was largely non-expert related. However, I want to add one thing in the final moments that I have here to talk about it. If the court looks at the expertise, excuse me, the background of Officer Workman, he testified that he is a computer forensic specialist and a network intrusion specialist. He's ICAC trained. He had gotten federal training on computer forensics. He's dumped over 100 cell phones and hundreds of computers. So if counsel were to stand up and say, you're on an object, this man has not been qualified as an expert witness. Well, he already actually kind of has been, except he wasn't presented as an expert witness. Surely an individual with this background who has dumped hundreds of phones and computers and has received extensive training in computer forensics, that could be hard to get him to qualify about how to make a Yahoo account. Okay. So I do think the state's evidence was extremely strong, and I don't think it was damaged in any way by any of its own internal presentation, and I don't think that this defense is sort of, I think, hate and merry defense that maybe someone else who did this renders the evidence anything other than not closely balanced. So because of an argument that could be made to the jury, and that the jury has to make a decision, doesn't diminish that legal fact, if you will. Does the court have any further questions? I would ask that we allow Mr. Bailey a minute or two just to touch on the counsel issue. The ineffective assistance? Yes. Okay. Yes. So I think I kind of touched on that a little bit here right now. Are we talking about trial counsel or are we talking about the – I'm sorry. Trial counsel in terms of what the relationship he had with the wildlife. Okay. Thank you. We got too ineffective assistance. I'm sorry. I'm sorry. So, yes. So what we have here is the – you know, the first thing I read from this court was the directions to consider the assistance. This is not the first time it's been up here. And I think that the court did a good job of sort of eliciting a lot of detail from both defense counsel and the defendant. The defendant's position was that, hey, look, you know, this guy is representing my wife in a divorce of my wife. He came to me with a power of attorney that she apparently paid $150 for. You know, then he presented this thing to me and told me to sign it so that he can, you know, sign it with her, I guess, to power over his monies and businesses, I think is how to describe it. The defense counsel, Mr. Bass, if I'm pronouncing it correctly, flatly denied all that. So there was no professional relationship with me and Mrs. Frakes. There was a discussion at some point about divorce proceedings and all that, but it never progressed beyond anything. I know that Mrs. Frakes' divorce case was pro se. I think I looked it up at one point before the first oral argument and it was still in that status. I don't know what it is now or if it's even still going on. But the court, I think, was given the opportunity to consider both, as it's supposed to do in a critical hearing, defendant's explanations, counsel's explanations. The defense counsel basically refuted anything that involved either, you know, representative in a power of attorney form. He received money from Mrs. Frakes as a retainer for the defense of the case and also $3,000 apparently for an expert witness. But there was nothing to basically indicate that he had anything to do with the defendant complaining that, well, you should make him turn over his phone records. But the court correctly pointed out, I'm not an investigator. I'm just here to listen to what you have to say and make a determination. One last thing, then, since I'm out of time once again. The standard of view is manifest weight, okay? So the opposite conclusion has to be apparent from the record. Here the court took competing interest and made a determination when it was plausibly denied by Mr. Bass. It's our position that the court correctly ruled on the crankle and denied the request for group post-trial counsel. Okay, thank you. Hopefully that answers your question. If I may, just. Yes, sir. So because one of the defendant's arguments is that during that crankle hearing, the trial court just basically kind of put blinders on and only looked at what was in that, like a 2017 letter to the court. But if I, my reading of the transcript, the trial court did kind of follow that, but then kind of opened it up and said, do you have anything else you want to talk about? Is that a correct reading of it? It's a correct reading. In fact, you know, the meaning of this court was specifically directed towards that letter because that's what prompted the crankle issue, appeal number one. But the court did explicitly, I think, attempt to draw from as much as possible. Is there anything else? Is there anything else? Is there anything else you want to talk about? And it did raise a couple of new things that he wanted to talk about, which the court considered and basically shot down. So there was no limitations or, I think, any kind of restraint put on the defendant here with regards to whatever complaints he may have had about Mr. Bass. Hopefully that answers your question. Thank you, Your Honor. Thank you, Your Honor. Anything further? Justice Sloan? Thank you, Mr. Daly. Ms. Sloan? Yes, Your Honors. So a few points. We're going for a closely balanced STD mental state. So whether he, excuse me, knowingly procured, received, or possessed the three images. There's also some debate. So no one owns up to or no one takes ownership of the actual email account that's linked to the flicker. So Mr. Frakes has an email account that he uses for work that was on his phone, but no one owns up to or takes ownership of the Angel Stevens account, which is where the images come from. So there is a backup email, which is Mr. Frakes' account, except basically anyone who knows his email, knows his phone number, will be able to make this account. So his own account has more information, but the Angel Stevens account only has the backup, which is his email account and his phone number. So anyone with access to that would be able to make this Angel Stevens account. And as counsel stated and Mr. Workman testified to, anyone can make an email account. So anyone could have made that account, and we're, again, but we're limiting it to the people who had access, potential access to his phone. Did Mr. Frakes ever acknowledge having any flicker account? There was some testimony saying that there was remnants of a flicker application on his phone, but there's no, as far as I know, there's no admission that he owned a flicker account, and I don't know if there's a flicker account associated with the bill's email account, which he admitted was his account, but not the Angel Stevens account. And the Angel Stevens account, though, had several thousand images on it? I believe the several thousands came from his phone. I think there was the several thousands of email and other material that they acquired from the Angel Stevens account, but there was no testimony about that, that the 18,000 emails or things that they acquired from the Angel Stevens account belonged to Mr. Frakes or being connected to Mr. Frakes, other than the backup account, which was the bill's account. So, in other words, the flicker account didn't contain all of his other personal photos and things of that nature? I don't believe there's testimony about that. But there's also nothing suggesting that there were only these three child porn images on the flicker account, right? That's the correct job. So are we to assume that there were more images than just those three on the flicker account? That would be my assumption. And no testimony or evidence as to any other issues that are clearly his personal photos or things of that nature? That's right. And Profield testified that he went through whatever workman asked him to go through. He went through those images, those things, one by one, and he found the three accounts that were initially flagged on the flicker. And, again, Mr. Frakes had five laptops, I believe, and he had the Samsung, he had the iPhone, and these were the three images that came out. And, again, that's our argument, seeing that, unlike Scalaro, unlike Milla, unlike Chains, where there were thousands upon thousands of images, CDs, discs, and access to hundreds of websites relating to these types of images, he does not have any of that. The state did not connect him to any of that. There was no evidence presented. These are the three photos we have. And, again, we're not saying that anyone and everyone could have accessed his account. It's just the people that were with him, maybe on the trip, or his family members who could have had access. And just touching upon the Krinkle issue, it's not merely just that Mr. Frakes was arguing that counsel talk to his wife. There was a clear claim saying that I didn't want him to talk to my wife because we're going through divorce proceedings. And here there's a financial tie. He was kind of at the whims or kind of being under the control of his wife and his wife's father-in-law because they were financing his defense. So Mr. Bass was being paid for by either the wife or, you know, what Mr. Frakes had at the time. He initially said he had money, but then he was arrested, so he was no longer working. So they were struggling, and there was an issue with the expert. He was struggling to find money for the expert. Eventually they were able to get the funds, but he was a little, if I can just finish, he was stuck with the wife and his father-in-law being able to continue to sponsor Mr. Bass's defense of him. And I think that's why a new independent attorney is needed in this case, to be able to go through that because Mr. Bass and Allison and Mr. Frakes and the father-in-law, they have this financial tie related to his defense and his effective defense. So what do you think about Justice Bowie's question, which was did the trial court open this up considerably to allow the defendant the opportunity to make more claims against his counsel? Our argument is that the court limited him. So when he tried to go beyond the letter, initially the court said, let's stick to the letter, look at the letter. This is what I'm going off of. If the court at the end opened it up, I don't know if Mr. Frakes would have known that he was opening it up beyond the letter when initially the court kept reeling him back into the letter. We're looking at your letter because this is what triggered the remand. So this is what we're looking at. So even at the end, after all of that, the court says, do you have anything else? I don't know if we can argue or we can say that he knew that this was opening up beyond the letter at that point. Because of the way the court had conducted the hearing. That's right. Up until if the court ever made an opening statement allowing him to go beyond the letter. The court never says you can go beyond the letter. I think it's limited to the letter, even if the court asks for anything else. And as I recall in this case, the defendant wanted to get an expert in this case. But by the time the funds were acquired, it was too late, Your Honor. And that's right. Or the court denied, the trial court denied him access to finding an expert. And that's one of the arguments is that even defense counsel, so Mr. Bass, initially was like we need an expert here. Or an expert could be helpful in our defense. An expert, you know, is needed. And when he couldn't acquire an expert, they just moved on from that. And then the money comes later. Once the wife or the father-in-law and the wife were able to acquire the $3,000. Did you have any concluding statement? We asked for a new trial, Your Honor, regarding our third argument or remand for the Crankville issue with new counsel appointed. Thank you, Your Honor. Any questions? Nope. Thank you very much. That concludes the arguments in 522-0408. The matter will be taken under advice of the Washington County Court. Thank you.